THIS DISPOSITION IS
CITABLE AS
PRECEDENT OF THE TTAB

5/14/02

Mailed: June 4, 2002
Paper No. 14
BAC

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

In re Tower Tech, Inc.

_____

Serial No. 75/709,532

_____

Scott R. Zingerman of Fellers, Snider, Blankenship, Bailey & Tippens, P.C. for Tower Tech, Inc.

Eugenia K. Martin, Trademark Examining Attorney, Law Office 114 (K. Margaret Le, Managing Attorney).

_____

Before Seeherman, Walters and Chapman, Administrative Trademark Judges.

Opinion by Chapman, Administrative Trademark Judge:

On May 19, 1999, Tower Tech, Inc. (an Oklahoma corporation) filed an application to register the mark SMARTTOWER on the Principal Register for "commercial and industrial cooling towers and accessories therefor, sold as a unit" in International Class 11.  The application is based on applicant's assertion of its bona fide intention to use the mark in commerce.

The Examining Attorney refused registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C.

§1052(e)(1), on the basis that, when used on or in connection with applicant's goods, the term SMARTTOWER is merely descriptive of them.

When the refusal was made final, applicant appealed to this Board.  Both applicant and the Examining Attorney have filed briefs.  Applicant requested an oral hearing, but prior to the scheduled hearing date, applicant withdrew its request.  An oral hearing was therefore not held in this case.

The Examining Attorney contends that the mark SMARTTOWER is comprised of two descriptive components, the combination of which does not change the overall descriptiveness of the mark.  She specifically contends that the relevant meaning of the word "smart" is defined in The American Heritage Dictionary (Third Edition 1992) as "5.a. of, relating to, or being a highly automated device, especially one that imitates human intelligence: smart missiles," and is defined in Webster's Encyclopedic Unabridged Dictionary (1996) as "17. Informal. equipped with, using, or containing electronic control devices, as computer systems, microprocessors, or missiles: a smart phone, a smart copier"[1]; that the word "tower" refers to

_____

[1] The American Heritage Dictionary definition was put into the record by the Examining Attorney, and the Webster's Encyclopedic

2

applicant's goods, "cooling towers"; and that applicant's goods are "smart" because they "contain microprocessors or otherwise use computers to control or perform their functions." (Brief, p. 2). The Examining Attorney concludes that the combination of "smart" and "tower" into a single word remains merely descriptive of this significant feature of the identified goods.

The evidence relied on by the Examining Attorney in support of the refusal consists of the dictionary definitions of the words "smart"; copies of several excerpted stories retrieved from the Lexis/Nexis "news library" database and copies of excerpts from patents retrieved from the Lexis/Nexis "patent library" database, all showing common use of the term "smart" in relation to computer-operated or otherwise automated items, including cooling towers.

Applicant urges reversal, arguing that the word "smart" has many different meanings as shown by both dictionary definitions (in American Heritage it is the fifth of six definitions and in Webster's it is the

---

Unabridged Dictionary definition was put into the record by applicant. Along with the Webster's dictionary definition, applicant submitted photocopies of two pages from the "How to Use this Dictionary" Section to show that definitions are ordered such that "the most frequently encountered meanings generally come before less common ones."

seventeenth of twenty-three definitions); that the word "tower" relates to a structure which is tall or high in proportion to its lateral dimension, and many cooling towers are not "towers" at all because they are not tall and do not have a height proportion greater than their lateral proportion; that the term "tower" covers "an enormous variety of structures which fit the general description of the term" (brief, p. 5) such as air traffic control towers, radio towers, cellular signal towers and high rise buildings; that a tower is a structure, not a device; and that when encountering the mark SMARTTOWER customers would recognize the meaning of "smart" as "clever or intelligent" which is a definition not applied to an inanimate object such as a tower. Applicant concludes from this that the term is suggestive (brief, pp. 5 and 7):

> In light of the incongruous meanings of the words "smart" and "tower" as described above, the compound mark "SMARTTOWER" does not merely describe commercial and industrial cooling towers and accessories therefor, sold as a unit, as asserted by the Examining Attorney. Rather, a mental connection must be made by the consumer to correlate the specific meanings of these words as applied to Applicant's recited goods. In other words, Applicant's mark is at most suggestive.

> The fact that an item, even a cooling tower, is computer controlled or even

4

> highly automated does not provide the
> potential customer with distinct
> knowledge or reasonably accurate
> information as to the function or
> characteristics of the item.  These
> terms only suggest something
> unspecified about the item which the
> customer must perceive from inspection
> to be highly automated.

In addition, in its reply brief (p. 3), applicant made specific comments about its involved goods:

> "The [Examining Attorney's]
> assertion that Applicant's cooling
> towers are smart because they
> contain microprocessors or otherwise
> use computers to control or perform
> their functions is apparently based
> on pure speculation,"

> and

> "in order to satisfy any potential
> lingering curiosity, pursuant to
> Applicant, the cooling towers
> manufactured and sold by Applicant
> do not contain a microprocessor."

The test for determining whether a term or phrase is merely descriptive under Section 2(e)(1) of the Trademark Act is whether it immediately conveys information concerning a quality, characteristic, function, ingredient, attribute or feature of the product or service in connection with which it is used or is intended to be used. See In re Abcor Development Corp., 588 F.2d 811, 200 USPQ 215 (CCPA 1978); In re Venture Associates, 226 USPQ 285 (TTAB 1985); and In re Bright-Crest, Ltd., 204 USPQ 591

5

(TTAB 1979). A term or phrase does not have to describe every quality, feature, function, etc. of the goods or services in order to be found merely descriptive; it is sufficient for the purpose if it describes a single significant quality, feature, function, etc. thereof.

Further, it is well-established that the determination of mere descriptiveness of a particular term or phrase must be made not in the abstract or on the basis of guesswork, but in relation to the goods or services for which registration is sought, the context in which the term or phrase is being used or is intended to be used on or in connection with those goods or services, and the impact that it is likely to make on the average purchaser of such goods or services. See In re Gyulay, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987); In re Consolidated Cigar Co., 35 USPQ2d 1290 (TTAB 1995); and In re Pennzoil Products Co., 20 USPQ2d 1753 (TTAB 1991). The question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods or services are will understand the mark to convey information about them. See In re Home Builders Association of Greenville, 18 USPQ2d 1313 (TTAB 1990); and In re American Greetings Corp., 226 USPQ 365 (TTAB 1985).

6

The evidence in the form of excerpted stories retrieved from the Lexis/Nexis database shows general use of the term "smart" in relation to myriad computer-operated or otherwise automated items, including smart elevators, smart thermostats, smart cards, smart locks, and smart traffic control systems. Some other examples of uses of "smart" in these stories are reproduced below:

> Headline: Letters
> ... In these days of smart bombs and computer-operated weapons, who could ever understand what we went through in World War II?
> "The Tampa Tribune," September 4, 2000;
>
> Headline: Computers to Shape Future Home Designs
> Shales discounts the idea of the much-touted "smart home" of the future – the computer-driven house where lights come on at voice commands or the lawn sprinkler goes into action when the ground gets dry.
> "Chicago Sun-Times," November 26, 1999; and
>
> Headline: Book Reviews, Vichy Soup
> ... This one is not for those frightened by today's techno babble. The futuristic thriller stars a rebellious computer-operated "smart" building. A nail biter, nightmare vision written by a scary Scot who blends technophobia,...
> "The Buffalo News," December 29, 1996.

Four of the six patent excerpts put into the record by the Examining Attorney show that cooling towers may be automated. They read, in relevant part, as follows:

7

Patent No. 4,507,930
Cooling Tower Monitor
"Chiller Plant Energy Conservation Operations" by K. Sinnamohideen and N. Olmstead, discloses the use of digital computers for calculating performance of a cooling tower....
Currently, there are no effective tools for monitoring cooling tower performance except for computers.

Patent No. 5,407,606
Oriented Spray-Assisted Cooling Tower
... Most recently, the thermal performance of cooling towers may be predicted by employing computer programs...;

Patent No. 4,885,011
Cooling Tower for the Cooling Water That Drains/ From the Condensor of a Steam Generator or the Condensors/ of a Plurality of Steam Generators
... The optimization of the course of the flow of cooling air and the smoke gas or the mixture of cooling air and smoke gas, for example, or during varying load conditions of the power station as well, can be effected automatically, e.g. by means of a suitable control computer. ...; and

Patent No. 4,830,757
Telemetry System for Water and Energy Monitoring
... Each remote station includes a water quality monitor computer 10 which monitors one or more physical properties of water in a cooling tower or other water system. ...
1. A method of telemetrically monitoring water treatment and an inventory of water treatment chemicals and adjusting water properties in a recirculating system including a boiler, cooling tower or scrubber with a computer-based system, comprising....

In this case, because automated systems are used as part of cooling towers, purchasers will readily perceive "smart" to mean "of, relating to, or being a highly automated device." Further, the word "tower," in the context of a cooling tower, will be perceived as referring to cooling towers. We see no reason why purchasers would view the word "tower," when used for a cooling tower, to mean, as applicant suggests, an air traffic control tower, a radio tower or a high rise building. Thus, the two words separately have a readily understood meaning in the industry, and when combined as the term SMARTTOWER and used on or in connection with applicant's goods ("commercial and industrial cooling towers and accessories therefor, sold as a unit"), the term merely describes cooling towers that are highly automated. There is no unique or incongruous meaning created.

Applicant's argument that the relevant purchasers would think of other possible meanings (e.g., "clever or intelligent," "fashionable or elegant," "saucy or pert") would require considering the applied-for mark in a vacuum. These meanings would clearly not come to mind when the term is viewed in connection with "commercial and industrial cooling towers and accessories therefor, sold as a unit." In addition, we are not persuaded that purchasers would go

9

through the technical mental exercise put forth by applicant of first thinking of "smart" as clever or intelligent, then rejecting this definition because it is not applicable to an inanimate object such as a tower, and then "apply several additional definitions to arrive at 'highly automated.'"

Applicant's argument regarding the various types of towers likewise would require the Board to consider the applied-for mark in a vacuum, rather than under the proper legal test relating the term to the goods for which applicant seeks registration.

Although applicant has stated that its goods "do not contain a microprocessor" (reply brief, p. 3), applicant did not deny that computers are used to control or perform the functions of cooling towers. Applicant's general statements in its brief and reply brief (quoted previously herein) suggest that cooling towers are computer controlled or highly automated. In any event, the Examining Attorney has clearly demonstrated that, in fact, computers, i.e., automated systems, are used to control or perform the functions of cooling towers. Thus, even though a microprocessor may not be physically present within the shell of the cooling tower itself, the record shows that cooling towers operate and are monitored through computers,

10

even though the computer may be remote or indirect rather than contained within the tower itself. The relevant purchasers of commercial and industrial cooling towers and accessories therefor are likely to be aware of the operation of same.

The Examining Attorney has established a prima facie showing that the term SMARTTOWER is merely descriptive of applicant's identified goods. See In re Cryomedical Sciences Inc., 32 USPQ2d 1377 (TTAB 1994) (SMARTPROBE held merely descriptive of disposable cryosurgical probes). We specifically note that in the Cryomedical case the applicant therein had stated that its cryosurgical probes may include a microprocessor, whereas in the case now before us applicant has specifically stated that its cooling towers do not contain a microprocessor. However, as explained previously, the evidence establishes that the functions and performance of cooling towers are highly automated; thus, it is reasonable to describe such towers as "smart."[2] Further, applicant's broad identification of goods encompasses both cooling towers that are controlled

---

[2] If applicant had stated that there is no microprocessor and that there is no computer control of the functions and/or performance of the cooling towers, then the Examining Attorney may have held the term deceptively misdescriptive.

11

by computers and cooling towers, if there are any, that are not controlled by such technology.

We find that even though applicant's cooling towers will not contain a microprocessor within the shell or structure of the tower itself, the record establishes the mere descriptiveness of the mark SMARTTOWER for commercial and industrial cooling towers and accessories therefor, sold as a unit, because the functions and performance of such towers are computer controlled, and will be so understood by the relevant consumers. "The factual situations in which mere descriptiveness must be resolved are too varied to lend themselves to resolution under any rigid formula." In re Omaha National Corporation, 819 F.2d 1117, 2 USPQ2d 1859, at 1861 (Fed. Cir. 1987).

In this case, it is our view that, if applied to applicant's identified goods, the term SMARTTOWER immediately describes, without conjecture or speculation, a significant feature or characteristic of applicant's goods, as discussed herein. Nothing requires the exercise of imagination, cogitation, mental processing or gathering of further information in order for purchasers of and prospective customers for applicant's goods to readily perceive the merely descriptive significance of the term SMARTTOWER as it pertains to applicant's goods.

12

**Decision**:  The refusal to register the mark as merely descriptive under Section 2(e)(1) of the Trademark Act is affirmed.